## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF FLORIDA

## JACKSONVILLE DIVISION

Keith Lavon Cooper

      Plaintiff,

      v.                               Case No. 3:19-cv-309-J-39MCR

Sergeant MASSEE, Officer SAILEE, Officer Saylor,

Warden Jim Freeman, Corizon Health, Inc.,

Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman,

Sgt. Phillips, Officer Whitney Stephen,

and Duty Officer Powell

      Defendants.

_____

## FOURTH AMENDED COMPLAINT

      Plaintiff, KEITH LAVON COOPER, files this Complaint against Defendants, Sergeant MASSEE, Officer SAILEE, OFFICER SAYLOR, Corizon Health, Inc., Warden Jim Freeman, Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman, Sgt. Phillips, Officer Whitney Stephen, and

1

Duty Officer Powell and as grounds therefore states as follows:

## NATURE OF THE ACTION

1. This is an action brought pursuant to 42 U.S.C. 1983, 1988, 28 U.S.C. 1331 and 1343, the Eighth and Fourteenth Amendments to the United States Constitution and the laws of the State of Florida after KEITH LAVON COOPER, was beaten and grievously injured on April 30, 2015 while in the custody and control of Defendants Sergeant MASSEE, Officer SAILEE, OFFICER SAYLOR, WARDEN JIM FREEMAN, Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman, Sgt. Phillips, Officer Whitney Stephen, and Duty Officer Powell, in the City of Sanderson, County of Baker and State of Florida.

## JURISDICTION AND VENUE

2. This Court has original jurisdiction pursuant to 28 U.S. C. § 1331 over Plaintiff's § 1983 claim.

3. This Court has supplemental jurisdiction over the state claims under 28 U.S.C. § 1367 because said claims are so related to Plaintiff's § 1983 claim, which is within this Court's original jurisdiction, since they arise out of the same case or controversy, under Article III of the United States Constitution.

4. Venue is proper herein under 28 U.S.C. § 1391(b) since the parties reside, or, at the time the events took place, formerly resided in this judicial district, and the events giving rise to the claims asserted herein occurred here as well.

## PARTIES TO THE ACTION

5. At all times relevant hereto KEITH LAVON COOPER, JR is a citizen of the United States and resident of the state of Florida.

2

6.  At all times relevant, Defendant, Corizon Health Inc., is and was a private corporation organized under the laws of the State of Florida but was under contract with the State to provide medical services to inmates at a state-prison hospital and is was therefore under color of state law when treating an inmate.

7.  At all times relevant, the Defendant, Corizon Health Inc., a corporation, provided medical services to inmates at Baker Correctional Center or Baker Work Camp and Taylor Correctional Center.

8.  During all relevant times, Defendant Sergeant MASSEE was employed by the Florida Department of Corrections.

9.  At all times relevant, when Defendant Sergeant MASSEE was engaging in the complained of conduct, he was acting under color of law and in the course of his employment as Baker Correctional Center Corrections Sergeant.

10. During all relevant times, Defendant Officer SAILEE was employed by the Florida Department of Corrections.

11. At all times relevant, when Defendant Officer SAYLOR was engaging in the complained of conduct, she was acting under color of law and in the course of her employment as a Baker Correctional Center Corrections Officer.

12. During all relevant times, Defendant Officer SAYLOR was employed by the Florida Department of Corrections.

13. At all times relevant, when Defendant Officer SAYLOR was engaging in the complained of conduct, she was acting under color of law and in the course of her employment as a Baker Correctional Center Corrections Officer.

14. During all relevant times, Defendant JIM FREEMAN was the Warden at Baker Correctional Center, resided in the Middle District of Florida and was employed by the FLORIDA DEPARTMENT OF CORRECTIONS and/or BAKER COUNTY.

15. At all times relevant, when Defendant Warden FREEMAN, JR. was engaging in the complained of conduct, he was acting under color of law and in the course of his employment as Baker Correctional Center and/or Baker Work Camp.

16. During all relevant times, Defendant Officer Bickerstaff was employed by the Florida Department of Corrections.

17. At all times relevant, when Defendant Officer Bickerstaff was engaging in the complained of conduct, she was acting under color of law and in the course of her employment as a Baker Correctional Center Corrections Officer.

18. During all relevant times, Defendant Sergeant Jay Burnett was employed by the Florida Department of Corrections.

19. At all times relevant, when Defendant Sergeant BURNETT was engaging in the complained of conduct, she was acting under color of law and in the course of her employment as a Baker Correctional Center Corrections Officer.

20. During all relevant times, Defendant Sergeant Guitherman was employed by the Florida Department of Corrections.

21. At all times relevant, when Defendant Sergeant Guitherman was engaging in the complained of conduct, she was acting under color of law and in the course of her employment as a Baker Correctional Center Corrections Officer.

22. During all relevant times, Defendant Sgt. Phillips was employed by the Florida Department of Corrections.

23. At all times relevant, when Defendant Sgt. Phillips was engaging in the complained of conduct, she was acting under color of law and in the course of her employment as a Baker Correctional Center Corrections Officer.

24. During all relevant times, Defendant Officer Whitney Stephen was employed by the Florida Department of Corrections.

25. At all times relevant, when Defendant Officer Whitney Stephen was engaging in the complained of conduct, she was acting under color of law and in the course of her employment as a Baker Correctional Center Corrections Officer.

26. During all relevant times, Defendant Officer Powell was employed by the Florida Department of Corrections.

27. At all times relevant, when Defendant Officer Powell was engaging in the complained of conduct, she was acting under color of law and in the course of her employment as a Baker Correctional Center Corrections Officer.

28. At all times relevant to this complaint, Defendants were acting under color of state law and their conduct constituted state action.

## FACTUAL ALLEGATIONS

1. **Incident Involving Keith Lavon Cooper**

29. Prior to April 2015, Defendants Defendants Massee, Sailee, Freeman, Bickerstaff, Burnett, Guitherman, Phillips, Stephen, and Powell were aware of rampant and dangerous gang activity in Baker Correctional Center.

30. Prior to April 2015, Defendants Massee, Sailee, Freeman, Bickerstaff, Burnett, Guitherman, Phillips, Stephen, and Powell were aware that gangmembers were violent and attacked other inmates.

31. Defendants Massee, Sailee, Freeman, Bickerstaff, Burnett, Guitherman, Phillips, Stephen, and Powell were aware or should have been aware of the following gang violence and contraband materials at Baker County Correctional:

   a. Heightened gang violence in Baker Correctional stretching into 2017 resulting in limitations to visits;

   b. In December 2013, there was an uptake of contraband snuck into the facility, including by a correctional officer;

   c. In April of 2016, hits were organized against certain offenders by inmates and gangmembers, including a hit on a convicted sex offender by a correctional officer;

   d. As of 2008, it was widely known that individuals from different gangs should be separated in Baker County Correctional Institution.

   e. As of June 30, 2013, 8,289 of the FDOC's 100,884 inmates were identified as gang members;

   f. As of June 30, 2015, 9,642 of the department's 100,050 inmates were identified as gang members; and,

   g. Baker County alone released 54 gang members on probation in 2013.

32. From or around July 2014, Plaintiff Keith Lavon Cooper was incarcerated at the Baker Work Camp at the Baker Correctional Center located in Sanderson, Florida for a nonviolent property crime.

33. The Baker Correctional Center and Work Camp is meant to "prepare inmates for work release and aid in successful re-entry into society".

34. Mr. Cooper was housed in the "HO4" Unit where inmates were not locked or confined to their cells during daylight hours.

35. The "HO4" Unit does not allow its inmates to out during the dark.

36. The "HO4" Unit is not supposed to allow inmates from other housing units into the Unit, including those from higher security units.

37. The "HO4" Unit has approximately 4-5 security check points, where inmates must show HO4 is their assigned unit, to enter.

38. The security check points are run by a Sergeant and Officer at all times.

39. On April 30, 2015, at least one security checkpoint was run by two trainees and not qualified officers.

40. Upon information and belief, each security check point has a camera system that is supposed to be functioning to record which inmates are allowed into the unit.

41. There are several other cameras throughout the unit.

42. If a camera is not functioning, officers are supposed to file a work order for the camera.

43. While incarcerated, the head of a prison gang called the "Cutthroats" named Nicholas Mitchell, aka "Terrorizer", threatened that if Mr. Cooper did not pay him he would be killed.

44. Because of this threat, Mr. Cooper sent money weekly to "Terrorizor" through family.

45. Mr. Cooper paid from $200-$600 monthly to ensure he was not being hurt or killed in prison.

46. It was widely known by officers including Defendants Massee, Sailee, Freeman, Bickerstaff, Burnett, Guitherman, Phillips, Stephen, and Powell, that the Terrorizor

required payment from inmates so he would not hurt or kill them in Baker County Correctional.

47. In or around April 2015, Mr. Cooper was unable to pay "Terrorizor" while "Terrorizor" was in solitary confinement.

48. Gang members within Baker Correctional Center informed Mr. Cooper he owed "Terrorizor" backpay and an additional $150-200.

49. A nonresident gang member, at the request of "Terrorizor", entered Mr. Cooper's housing unit (F Dorm) and attempted to strike Mr. Cooper with a lock in a sock.

50. Mr. Cooper was able to defend himself at that time.

51. The same week, three gang members attacked Mr. Cooper and he was able to escape them and defend himself.

52. Defendants Massee, Sailee and/or Saylor, Bickerstaff, Burnett, Guitherman, Phillips, Stephen, and Powell were all assigned to F Dorm and knew Mr. Cooper had been attacked by nonresident inmate gangmembers on two occasions and had escaped.

53. On April 30, 2015, corrections officers, including Defendants Massee, Sailee and/or Saylor, Bickerstaff, Burnett, Guitherman, Phillips, Stephen, and Powell searched F Dorm and sent all inmates into the yard while the search took place.

54. While in the yard, Mr. Cooper was confronted by four gang members who informed him he had to come up with the money.

55. While walking back into the F Dorm, Mr. Cooper was attacked by the same four gang members, including an individual named Oscar Jiles.

56. Defendant Corrections Defendants Massee, Bickerstaff, Burnett, Guitherman, Phillips, Sailee/Saylor, Stephen, and Powell saw the attack on Mr. Cooper, and failed to intervene or place Mr. Cooper in protective custody.

57. Defendants Massee, Bickerstaff, Burnett, Guitherman, Phillips, and Powell did not inform anyone that this attack had occurred, take any precautions in response to what was clearly a four against one attack, or take any measures to ensure Mr. Cooper's safety after they knew he was in danger.

58. Despite Defendants' inaction, Mr. Cooper was able to fight off the gang members who had no weapons at that time, with no assistance of guards.

59. After escaping the attack, Mr. Cooper and other inmates lined up for the count of inmates for F Dorm and to be allowed back into their dorm.

60. One of the gang members who had previously attacked Mr. Cooper, Oscar Jiles, who resided in G Dorm, was counted with the F Dorm residents and allowed inside by Defendants Massee, Bickerstaff, Burnett, Guitherman, Phillips, and Powell.

61. Defendants Massee, Bickerstaff, Burnett, Guitherman, Phillips, and Powell did not check identification of inmates who were assigned F Dorm during the count nor were the number of inmates verified.

62. Due to Defendants Massee, Bickerstaff, Burnett, Guitherman, Phillips, and Powell's deliberate indifference, additional gangmembers who were not residents of F Dorm entered the dorm.

63. Due to Defendants Massee, Bickerstaff, Burnett, Guitherman, Phillips, and Powell's deliberate indifference, the gangmembers that officers had just seen threatening and fighting Mr. Cooper were allowed in F Dorm.

64. Defendants Massee, Bickerstaff, Burnett, Guitherman, Phillips, and Powell failed to inform and/or insure they informed Defendants Sailee/Saylor and/or Whitney Stephen that because the attack on Mr. Cooper by nonresident gangmembers they should not allow said inmates into the F dorm.

65. After the count, Gangmembers including Keith Jones, Booda, Robert (C Dorm Resident), Cut, Jermaine Haze, Antonio, and Arbo attempted to get inside of F Dorm despite not residing there and not having identification to be let in.

66. Despite their non-residence in the dorm, their known identity as gang-members, and the officers' clearly known danger to Mr. Cooper, Defendant Corrections Officer Sailee and/or Saylor and Defendant Whitney Stephen buzzed the dorm/pod door allowing them access to F Dorm.

67. Despite their non-residence in the dorm, their known identity as gang-members, and the officers' clearly known danger to Mr. Cooper, Defendant Corrections Officer Sailee and/or Saylor and Defendant Whitney Stephen allowed Gangmembers including Oscar Jiles, Keith Jones, Booda, Robert (C Dorm Resident), Cut, Jermaine Haze, Antonio, and Arbo into F Dorm and near Mr. Cooper's cell with weapons, including locks, a plexiglass knife, and an ice pick.

68. Defendants Sailee and/or Saylor and Defendant Whitney Stephen allowed nonresident gangmembers access to F Dorm with weapons, including locks, a plexiglass knife, and an ice pick.

69. Defendants Sailee and/or Saylor and Defendant Whitney Stephen knew said weapons were dangerous, deadly, and especially a risk to Mr. Cooper, who had recently been attacked three times.

70.  None of these gangmembers were assigned to F Dorm and should have not been present or allowed in.

71. At the time that the gangmembers entered Mr. Cooper's cell, officers Sailee/Saylor and Whitney Stephen knew the gangmembers did not reside in F Dorm and were targeting Mr. Cooper.

72. On April 30, 2015, At or around 3:15PM, Mr. Cooper was attacked by the gang members in his cell.

73. The gangmembers entered the cell of Mr. Cooper and he was hit with fists, stabbed in the head, stabbed in the face, punched, kicked, and beaten repeatedly.

74. Mr. Cooper went in and out of consciousness and counted up to 22 individuals violently attacking him at various times.

75. Defendants Massee, Bickerstaff, Burnett, Guitherman, Phillips, Saylor/Sailee, Stephen and Powell could see the entire attack in person and on closed circuit television take place.

76. The attack itself was videotaped by closed circuit security cameras, that were visible at the time of the attack and being viewed by Defendants Freeman, Massee, Bickerstaff, Burnett, Guitherman, Phillips, Saylor/Sailee, Stephen and Powell.

77. Defendants Massee, Bickerstaff, Burnett, Guitherman, Phillips, Saylor/Sailee, Stephen and Powell were within the security room within F Dorm and observed the full attack.

78. Defendant Freeman observed the full attack through closed circuit television and did nothing in response and despite the ongoing length of the attack, did not intervene to stop further injury.

79. Defendants Massee, Bickerstaff, Burnett, Guitherman, Phillips, Saylor/Sailee, Stephen and Powell did nothing in response and despite the ongoing length of the attack, did not intervene to stop further injury.

80. Defendants Massee, Bickerstaff, Burnett, Guitherman, Phillips, Saylor/Sailee, Stephen and Powell did not hit the panic button or call for back up or attempt to stop the attack.

81. Defendant Freeman did not hit the panic button or call for back up or attempt to stop the attack.

82. Defendant Officer Sailee and/or Officer Saylor reported that she did not hit the panic button because she was afraid.

83. Eventually Defendant Sgt. Massee returned to the dorm and handcuffed only Mr. Cooper to escort him to the medical unit.

84. Mr. Cooper identified Robert and Oscar Jiles as inmates who had attacked him on the way to the medical unit.

85. There was no work order for the camera closest to the incident.

86. Upon information and belief, the camera was in working order and caught the attack of Mr. Cooper.

87. Upon information and belief, no review was done of the camera footage by Baker personnel.

88. Currently, the cameras in HO4 record over every 30 days.

89. Upon information and belief, at the time of the incident the recording of the attack was recorded over in less than 30 days.

90. No review was done of the camera footage by Baker personnel nor was the video made available to Mr. Cooper.

12

91. Inmates who do not reside in a dorm cannot be admitted unless a corrections officer allows them to.

92. In order to enter a pod or dorm, an inmate must show his identification to gain access and must be buzzed in by a corrections officer.

93. Before April 30, 2015, another inmate was attacked and paralyzed by inmates in E Dorm, who did not reside in E Dorm that the Defendant Officers and Defendant Freeman were aware of.

94. By June 17, 2015, Mr. Cooper's attackers were taken out of confinement and placed back in regular population by Defendant Freeman.

95. Officers that were on duty on the date of Mr. Cooper's attack were not disciplined by Defendant Freeman for the events of the day.

96. After the incident, family of Mr. Cooper received text messages that if Mr. Cooper "snitched" they would come after his mother.

97. Defendants Massee, Bickerstaff, Burnett, Guitherman, Phillips, Saylor/Sailee, Stephen and Powell knew that gangs targeted individuals for payment, knew Mr. Cooper had been attacked repeatedly in the days and day preceding his attack, knew individuals who did not reside in F Dorm were attempting to gain access, knew individuals targeting Mr. Cooper were attempting to gain access to F Dorm, and once the attack began knew Mr. Cooper was being targeted but failed to intervene or protect Mr. Cooper.

98. Defendants Massee, Bickerstaff, Burnett, Guitherman, Phillips, Saylor/Sailee, Stephen and Powell failed to intervene in the attack on Mr. Cooper or stop it once it started despite seeing it occur.

99. Defendant Freeman knew that gangs targeted individuals for payment, knew or should have known Mr. Cooper had been attacked repeatedly in the days and day preceding his attack, knew or should have known individuals who did not reside in F Dorm were attempting to gain access, knew or should have known individuals targeting Mr. Cooper were attempting to gain access to F Dorm, knew or should have known Mr. Cooper was in danger, and once the attack began knew Mr. Cooper was in danger and being targeted but failed to intervene or protect Mr. Cooper.

100. Defendant Freeman failed to intervene in the attack on Mr. Cooper or stop it once it started despite seeing it occur on closed-circuit television.

101. On April 30, 2015, Mr. Cooper was taken to the medical unit and then air-lifted to Shands Hospital.

102. Shands Hospital stopped the bleeding and discharged him to Baker Correctional on May 1, 2015.

103. Mr. Cooper was released from Shands Hospital with brain trauma, including 4mm of brain hemorrhaging and a right partial fracture in his skull.

104. Corizon Health, Inc., perpetuating its longstanding tradition of failing to keep adequate medical records, failed to keep records for Mr. Cooper's brain hemorrhaging or right partial fracture in his skull.

105. Upon arrival to Baker Correctional, Corizon Health, Inc. failed to arrange a meeting or follow up with Mr. Cooper to see a doctor, although such treatment was requested by Shands Hospital.

106. Corizon Health, Inc. failed to provide Mr. Cooper with any follow-up medical care for three days.

107.     On Monday May 4, 2015, Mr. Cooper saw a Corizon Health, Inc. doctor for the

first time and instead of receiving medical care was immediately sent him to Taylor

Correctional.

108.     On Monday, May 4, 2015, Mr. Cooper was sent to Taylor Correctional Center,

and Corizon Health, Inc. failed to communicate his medical condition or send his medical

records to indicate his injuries.

109.     Due to the lack of communication or records by Corizon Health, Inc. regarding

his medical condition, Mr. Cooper was sent to solitary confinement, despite multiple

staples in his head from treatment and his inability to walk.

110.     Corizon Health, Inc. sent Mr. Cooper to Taylor Correctional without

documentation to show his medical condition and recent hospitalization.

111.     Mr. Cooper could not walk at the time he arrived to Taylor Correctional, but

could not prove his condition through medical records.

112.     Officers threatened Mr. Cooper in an attempt to get him to walk or move.

113.     Due to the conditions of the cell and the fact that he was not sent to the infirmary

by Corizon Health, Inc. upon his transfer, Mr. Cooper had no choice but to urinate on

himself as he could not walk.

114.     Mr. Cooper requested medical attention multiple times before being taken to the

infirmary at Taylor Correctional.

115.     Finally, more than a week after arriving at Taylor Correctional Mr. Cooper was

sent to the infirmary by Corizon Health, Inc. staff.

116.     Mr. Cooper remained at Taylor Correctional for three weeks, during which time he was not given a shower and would be left on the toilet for hours at a time by Corizon Health, Inc. staff.

117.     Finally, on May 14 or May 21, 2015, Mr. Cooper was taken for an MRI at Tallahassee Memorial days after he was requested to do so by Shands Hospital Staff.

118.     Doctors at Tallahassee Memorial informed Mr. Cooper and Corizon Health, Inc. staff that he should be referred to a neurologist within 2 days.

119.     Mr. Cooper returned to Taylor Correctional and but Corizon Health, Inc. did not arrange for him to see another doctor or neurologist for weeks.

120.     After weeks without seeing a doctor, Mr. Cooper was sent to Reception and Medical Center for an MRI, where he was diagnosed with a pinched nerve or swelling in his brain.

121.     Due to the failure to provide medical care, Mr. Cooper developed cists and bed sores on his back side.

122.     Due to his mistreatment by Corizon Health, Inc. staff, Mr. Cooper's injuries were exacerbated, took longer to heal, and became more complicated.

123.     Mr. Cooper fell multiple times and developed additional injuries while in the care of Corizon Health, Inc. due to the slow treatment and abuse he suffered.

124.     As a result of the subject incident, Mr. Cooper was severely injured including hand, arm and leg pain, lacerations to his head, deformity to his eyebrow, multiple stab wounds to his arm and head, bruising and injury to his rib cage and upper back, abrasions to his legs, nasal bone fracture requiring surgery, paralysis in his legs and lower extremities requiring physical therapy, numbness in his lower extremities, headaches,

complications with his eyesight including blurred vision and a parietal fracture, brain

trauma, and the inability to be mobile without a wheelchair, among other injuries.

125.      From April 29, 2015 to August 1, 2015, Mr. Cooper's lower extremities were

paralyzed; he was paraplegic with numbness in his bilateral lower extremities.

126.      Mr. Cooper was considered a fall risk with continued impaired mobility and was

wheel chair bound due to his assault.

127.      As a result of the subject incident, Mr. Cooper, continues to have difficulty

walking.

128.      On December 30, 2015, Mr. Cooper was moved to the Suwannee Correctional

infirmary.

129.      At all relevant times, Mr. Cooper did not receive appropriate medical care.

**2.  Corizon Health, Inc.'s Failure to Provide Medical Care**

130.      Corizon Health was one of the nation's largest for-profit medical providers for

prisons and jails.

131.      In 2013, Corizon Health, Inc. received the contract for the Florida Department of

Corrections.

132.       Corizon Health, Inc. from the inception of its work in Florida has failed to

provide adequate treatment and services to prisoners.

133.      Corizon Health, Inc.'s Failure to provide medical care within Florida include the

following:

a.  A diabetic woman who went almost three months without insulin;

b. An inmate who was referred to an MRI and surgical consult for a lump behind her ear and got neither consult;

c. An inmate whose physician requested urgent thyroid surgery, which was ignored for eight months;

d. Inmates treated with Tylenol for undiagnosed cancer; and,

e. An inmate who waited for two months for treatment of a life-threatening brain aneurysm.

134.    The following inmates were injured and/or died due to failure to receive adequate medical care from Corizon Health, Inc.:

a. In 2009, inmate Tracy Viera died from untreated opiate withdrawal, after being left alone in a cell for four days;

b. In 2009, inmate Joan Graever lost a baby after treatment was delayed for a blood condition that was lethal to her fetus;

c. Between 2002-2004, two inmates in the Palm Beach County Jail where Corizon Health Inc. handled medical care, died when treatment was withheld, including for HIV;

d. In 2010, inmate Jovon Frazier's arm pain was treated with Tylonel before an MRI demonstrated he had cancer;

e. In 2010, inmate Randall Jordan-Aparo, who suffered from a genetic blood disorder was denied medical attention, was forced into an isolation cell and gassed him until he could no longer breathe; and,

      f.   1,800 Florida Prison inmates were denied medical care for hernias, in a class action which settled in 2017.

135.     In 2016, Corizon Health, Inc. withdrew from its contract with FDOC.

136.     During its tenure working for the FDOC, Corizon Health Inc. failed to keep adequate records of medicines administered, vital signs, diagnoses, incomplete medical records, gaps in treatment and records, and failed to keep records that identified if certain ill inmates were checked on.

137.     Prison inmate mortality in Florida had hit a 10-year high while under the care of Corizon Health, Inc.

138.     Corizon Health, Inc. failed to provide adequate medical care to individuals throughout the state prisons it provided care for:

      a.   In March of 2017, Corizon Health, Inc. failed to provide adequate medical care to Denise Gertrude Forte as her lung disease symptoms worsened and as a result, she passed away. *Forte v. Corizon Health,* U.S.D.C. (N.D. Ga.), Case No. 1:17-cv-01096-SCJ.

      b.   In March of 2017, Corizon Health, Inc. failed to provide adequate medical care to Raheen Dudley, after he requested care for pain in his lower stomach, refusing him medical care for five days, resulting in his appendix bursting and other complications. *Dudley v. Genesee County,* U.S.D.C. (E.D. Mich.), Case No. 2:17-cv-10800-AJT-SDD.

      c.   In May 2016, Corizon Health, Inc. failed to provide medical care to Prince Robinson in a Georgia prison, resulting in him losing right in his right eye.

d.  In April of 2016, an Arizona prisoner Eric Carlson sued Corizon Health, Inc. because his wrist was crushed and he was not given medical attention for 6 days. *Carlson v. Corizon Health,* U.S.D.C. (D. Ariz.), Case No. 2:17-cv-01490-DLR-JZB.

e.  In April 2016, Corizon Health, Inc. failed to provide medical care to Ezekiel Verdugo though he was experiencing severe abdominal pain for a week resulting in sepsis.

f.  In May 2015, Corizon Health, Inc. failed to provide medical care to Tyler Tabor, in jail in Colorado, resulting in his death due to dehydration. *Tabor v. Adams County,* U.S.D.C. (D. Col.), Case No. 1:16-cv-01587-MSK-MJW.

g.  In 2015, Corizon Health, Inc. failed to provide medical care to a man who died at a New Mexico prison in 2015 resulting in paralyzis paralyzed from the waist down and ultimately died because prison officials ignored his pleas for medical care.

h.  In January 2015, Corizon Health, Inc. failed to provide medical care to Mathew Ajibade in a Georgia prison, resulting in being tased for a manic episode after not receiving his bipolar medication. *Ajibade v. Harris,* U.S.D.C. (S.D. Ga.), Case No. 4:16-cv-00082-WTM-GRS.

i.  In April 2014, Corizon Health, Inc. failed to provide medical care to Madaline Pitkin after four requests in an Oregon Prison, resulting in her death. *Pitkin v. Corizon Health,* U.S.D.C. (D. Ore.), Case No. 3:16-cv-02235-AA.

j.   In 2014, Corizon failed to provide Oregon inmate Angelo James Fricano mental health services and instead put him in isolation for two weeks. *Fricano v. Lane County,* U.S.D.C. (D. Ore.), Case No. 6:16-cv-01339-MC.

k.   Around 150 lawsuits have been filed against Corizon by New Mexico prisoners since 2007 for delayed care that resulted in medical conditions worsening, becoming chronic and resulting in lifetime disabilities.

l.   In California, Corizon Health Inc. failed to provide medical care to Mario Martinez, resulting in his deato due to an asthma attack and nasal polyps. *Martinez v. Corizon Health,* U.S.D.C. (N.D. Cal.), Case No. 4:16-cv-00881-JSW.*Glisson v. Ind. Dep't of Corr.,* 849 F.3d 372 (7th Cir. 2017), *petition for cert. filed.*

139.   Corizon Health, Inc. deliberately structures the delivery of medical care in a way that lacks critical oversight.

140.   According to Southern Poverty Law Center, Corizon Health, Inc. avoids sending inmates out to specialists if it can be helped.

141.   Corizon Health, Inc. has lost multiple prison and jail contracts, due to its failure to provide medical care in detainees and inmates.

## COUNT I—VIOLATION UNDER 42 U.S.C § 1983: 8TH AMENDMENT

***(Keith Lavon Cooper v. Defendants Massee, Bickerstaff, Burnett, Guitherman, Phillips, Saylor/Sailee, Stephen, Freeman and Powell)***

142.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 129 with the same force and effect as if fully set out in specific detail herein below.

143.     Plaintiff KEITH LAVON COOPER had a constitutional right to be free from unlawful assaults, attacks, injuries, and abuse while imprisoned at the Baker Correctional Center.

144.     The Plaintiff had a constitutional right to be free from cruel and unusual punishment while imprisoned at the Baker Correctional Center.

145.     At all times relevant to this complaint, Defendants Massee, Bickerstaff, Burnett, Guitherman, Phillips, Saylor/Sailee, Stephen, Powell and Defendant Freeman, were employed by the FLORIDA DEPARTMENT OF CORRECTIONS. All actions performed by Defendants SERGEANT MASSEE, Defendant Freeman, Officer Saylor, Officer Sailee, Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman, Sgt. Phillips, Officer Whitney Stephen, and Duty Officer Powell were done under color of state law and constitute state action.

146.     At all times relevant, it was the duty of Defendants, individually and as officers, agents and/or employees of FLORIDA DEPARTMENT OF CORRECTIONS, to refrain from subjecting others to cruel and unusual punishment, including Plaintiff COOPER.

147.     Defendants SERGEANT MASSEE, Officer Saylor, Officer Sailee, Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman, Sgt. Phillips, Officer Whitney Stephen, Duty Officer Powell, and Defendant Freeman were aware that Plaintiff COOPER faced a substantial risk of serious bodily harm through their actions and inactions.

148.     Defendants SERGEANT MASSEE, Officer Saylor, Officer Sailee, Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman, Sgt. Phillips, Officer Whitney Stephen,

Duty Officer Powell, and Defendant Freeman were aware that Plaintiff COOPER faced a substantial risk of serious bodily harm, yet failed to do anything to stop it.

149. Defendants SERGEANT MASSEE, Officer Saylor, Officer Sailee, Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman, Sgt. Phillips, Officer Whitney Stephen, Duty Officer Powell, and Defendant Freeman acted with deliberate indifference to the substantial risk of serious bodily harm to Plaintiff COOPER.

150. Defendants SERGEANT MASSEE, Officer Saylor, Officer Sailee, Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman, Sgt. Phillips, Officer Whitney Stephen, Duty Officer Powell, and Defendant Freeman's failure to stop or take action to stop the unlawful assaults, attacks, injuries, and abuse constituted deliberate indifference to the known and obvious consequences of violating Plaintiff's constitutional rights and causing him great bodily injury.

151. The effect of the inaction and abuses, as outlined above, deprived Plaintiff COOPER of his statutory and constitutional rights granted by the Eighth Amendment to the United States Constitution and 42 U.S.C. Section 1983.

152. On April 30, 2015, in breach of said duty, Defendants Massee, Bickerstaff, Burnett, Guitherman, Phillips, Saylor/Sailee, Stephen, Powell and Defendant Freeman subjected Plaintiff COOPER to cruel and unusual punishment in violation of the privileges and immunities secured to Plaintiff COOPER by the Fourteenth and Eighth Amendments to the United States Constitution by engaging in the following acts or omissions:

    a. Failing to protect Mr. Cooper from threats and coercion from prison gangs such as the "Cutthroats" when they knew he was in danger from the gang;

b.   Failing to check identification before allowing inmates to enter housing units they do not reside in when they knew Mr. Cooper had recently been attacked by non-resident gangmembers;

c.   Affirmatively allowing inmates to enter housing units they do not reside in when they knew Mr. Cooper had recently been attacked by non-resident gangmembers;

d.   Failing to protect Mr. Cooper from attacks by gangmembers who they knew were targeting Mr. Cooper;

e.   Failing to ensure inmates do not have access to weapons such as locks, plexiglass knives, and icepicks, especially those non-resident gangmembers who were known to be targeting and attacking Mr. Cooper;

f.   Failing to identify weapons and items that could be used as weapons during the search of F dorm;

g.   Failing to protect Mr. Cooper from attacks or stop attacks by gangmembers that were ongoing and observed by officers;

h.   Failing to inform dorm guards or take any precautionary action after observing gangmembers attack Mr. Cooper;

i.   Failing to take measures to ensure Mr. Cooper's safety when they knew he was in danger;

j.   Failing to accurately count or verify the inmates who reside in F Dorm before allowing nonresident inmates to enter, even after witnessing an attack on Mr. Cooper by nonresident inmates;

k.  Buzzing inmates who are known members of a gang into dorms they do not reside in, even after witnessing an attack on Mr. Cooper by nonresident inmates;

l.  Affirmatively allowing gang members known to be seeking to attack Plaintiff Cooper into his dorm;

m.  Allowing gang members to hit, stab, punch, kick, and beat Mr. Cooper within his dorm;

n.  Failing to stop the attack on Mr. Cooper by 22 individuals despite observing it in person and on camera;

o.  Failing to hit the panic button or request backup when the attack was occurring;

p.  Failing to separate, discipline, investigate and press charges against the gang members who attacked Mr. Cooper; and,

q.  Despite the knowledge that Mr. Cooper was being attacked and that gang members were allowed into F Dorm, unjustifiably delaying in protecting Mr. Cooper, not allowing non-residents into the dorm, stopping the fight, calling for back up, or otherwise rendering aid to Mr. Cooper.

153.   At all times relevant, the aforementioned conduct of Defendants constituted utter indifference and reckless disregard of the reasonably foreseeable and serious risk of harm to Plaintiff COOPER in violation of the United States Constitution.

154.   The actions of Defendants were objectively unreasonable and were undertaken intentionally with willful indifference to Plaintiff COOPER's constitutional rights to be free from cruel and unusual punishment.

155.     The actions of Defendants would not be considered reasonable by a reasonably competent officer in the circumstances presented at the time of Defendants conduct.

156.     The actions of Defendants were undertaken with malice, willfulness, and reckless indifference to the rights of Plaintiff COOPER

157.     As proximate cause of Defendants SERGEANT MASSEE, Officer Saylor, Officer Sailee, Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman, Sgt. Phillips, Officer Whitney Stephen, Duty Officer Powell, and Defendant Freeman's deliberate indifference to the repeated incidences of serious bodily harm inflicted on Plaintiff COOPER, Plaintiff suffered physical injury, severe emotional and mental distress, humiliation, and disability.

158.     Moreover, as a proximate cause of Defendants SERGEANT MASSEE, Officer Saylor, Officer Sailee, Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman, Sgt. Phillips, Officer Whitney Stephen, Duty Officer Powell, and Defendant Freeman's conduct, Plaintiff suffered injuries and is entitled to recover all damages allowable for constitutional violations such as 42 USC § 1983, including compensatory damages, special damages, economic damages, all costs incurred in prosecuting this action, and attorney's fees pursuant to 42 USC § 1988.

WHEREFORE, Plaintiff COOPER demands judgment against Defendants SERGEANT MASSEE, Officer Saylor, Officer Sailee, Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman, Sgt. Phillips, Officer Whitney Stephen, Duty Officer Powell, and Defendant Freeman for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

## COUNT II - U.S.C. §1983—Deliberate Indifference

*(Keith Lavon Cooper v. Massee, Sailee, Freeman, Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman, Sgt. Phillips, Officer Whitney Stephen, Duty Officer Powell)*

159.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 129 with the same force and effect as if fully set out in specific detail herein below.

160.     At all times relevant to this complaint, Defendants SERGEANT MASSEE, Officer Saylor, Officer Sailee, Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman, Sgt. Phillips, Officer Whitney Stephen, Duty Officer Powell, and Defendant Freeman were employed by Defendant FLORIDA DEPARTMENT OF CORRECTIONS. All actions performed by Defendants Sergeant MASSEE, Officer SAILEE, Defendant Freeman, Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman, Sgt. Phillips, Officer Whitney Stephen, and Duty Officer Powell were done under color of state law and constitute state action.

161.     At all times relevant, it was the duty of Defendants, individually and as officers, agents and/or employees of FLORIDA DEPARTMENT OF CORRECTIONS, to refrain from subjecting others to a deprivation of rights, including Plaintiff COOPER.

162.     On April 30, 2015, in breach of said duty, Defendants subjected Plaintiff COOPER to a deprivation of rights in violation of the privileges and immunities secured to Plaintiff COOPER By the Fourteenth and Eighth Amendments to the United States Constitution by engaging in the following acts or omissions:

  a.  Failing to protect Mr. Cooper from threats and coercion from prison gangs such as the "Cutthroats" when they knew he was in danger from the gang;

  b.  Failing to check identification before allowing inmates to enter housing units they do not reside in when they knew Mr. Cooper had recently been attacked by non-resident gangmembers;

c.  Affirmatively allowing inmates to enter housing units they do not reside in when they knew Mr. Cooper had recently been attacked by non-resident gangmembers;

d.  Failing to protect Mr. Cooper from attacks by gangmembers who they knew were targeting Mr. Cooper;

e.  Failing to ensure inmates do not have access to weapons such as locks, plexiglass knives, and icepicks, especially those non-resident gangmembers who were known to be targeting and attacking Mr. Cooper;

f.  Failing to identify weapons and items that could be used as weapons during the search of F dorm;

g.  Failing to protect Mr. Cooper from attacks or stop attacks by gangmembers that were ongoing and observed by officers;

h.  Failing to inform dorm guards or take any precautionary action after observing gangmembers attack Mr. Cooper;

i.  Failing to take measures to ensure Mr. Cooper's safety when they knew he was in danger;

j.  Failing to accurately count or verify the inmates who reside in F Dorm before allowing nonresident inmates to enter, even after witnessing an attack on Mr. Cooper by nonresident inmates;

k.  Buzzing inmates who are known members of a gang into dorms they do not reside in, even after witnessing an attack on Mr. Cooper by nonresident inmates;

l.  Affirmatively allowing gang members known to be seeking to attack Plaintiff Cooper into his dorm;

28

m.  Allowing gang members to hit, stab, punch, kick, and beat Mr. Cooper within his dorm;

n.  Failing to stop the attack on Mr. Cooper by 22 individuals despite observing it in person and on camera;

o.  Failing to hit the panic button or request backup when the attack was occurring;

p.  Failing to separate, discipline, investigate and press charges against the gang members who attacked Mr. Cooper; and,

q.  Despite the knowledge that Mr. Cooper was being attacked and that gang members were allowed into F Dorm, unjustifiably delaying in protecting Mr. Cooper, not allowing non-residents into the dorm, stopping the fight, calling for back up, or otherwise rendering aid to Mr. Cooper.

163.    At all times relevant, the aforementioned conduct of Defendants SERGEANT MASSEE, Officer Saylor, Officer Sailee, Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman, Sgt. Phillips, Officer Whitney Stephen, Duty Officer Powell, and Defendant Freeman constituted utter indifference and reckless disregard of the reasonably foreseeable and serious risk of harm to Plaintiff COOPER in violation of the United States Constitution.

164.    The actions of Defendants SERGEANT MASSEE, Officer Saylor, Officer Sailee, Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman, Sgt. Phillips, Officer Whitney Stephen, Duty Officer Powell, and Defendant Freeman were objectively unreasonable and were undertaken intentionally and with willful indifference to Plaintiff Cooper's constitutional rights.

165.     The actions of Defendants SERGEANT MASSEE, Officer Saylor, Officer Sailee, Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman, Sgt. Phillips, Officer Whitney Stephen, Duty Officer Powell, and Defendant Freeman would not be considered reasonable by a reasonably competent officer in the circumstances presented at the time of Defendants' conduct.

166.     The actions of Defendants SERGEANT MASSEE, Officer Saylor, Officer Sailee, Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman, Sgt. Phillips, Officer Whitney Stephen, Duty Officer Powell, and Defendant Freeman were undertaken with malice, willfulness, and reckless indifference to the rights of Plaintiff.

167.     The effect of Defendants SERGEANT MASSEE, Officer Saylor, Officer Sailee, Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman, Sgt. Phillips, Officer Whitney Stephen, Duty Officer Powell, and Defendant Freeman actions deprived Plaintiff of his statutory and constitutional rights granted under the Eight Amendment to the United States Constitution and 42 U.S.C. Section 1983.

168.     As proximate cause of Defendants SERGEANT MASSEE, Officer Saylor, Officer Sailee, Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman, Sgt. Phillips, Officer Whitney Stephen, Duty Officer Powell, and Defendant Freeman's deliberate indifference to the repeated incidences of serious bodily harm inflicted on Plaintiff COOPER, Plaintiff suffered physical injury, severe emotional and mental distress, humiliation, and disability.

169.     Moreover, as a proximate cause of Defendants SERGEANT MASSEE, Officer Saylor, Officer Sailee, Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman, Sgt. Phillips, Officer Whitney Stephen, Duty Officer Powell, and Defendant Freeman's conduct, Plaintiff suffered injuries and is entitled to recover all damages allowable for constitutional

violations such as 42 USC § 1983, including compensatory damages, special damages, economic damages, all costs incurred in prosecuting this action, and attorney's fees pursuant to 42 USC § 1988.

WHEREFORE, Plaintiff COOPER demands judgment against Defendants SERGEANT MASSEE, Officer Saylor, Officer Sailee, Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman, Sgt. Phillips, Officer Whitney Stephen, Duty Officer Powell, and Defendant Freeman for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

## COUNT III – 42 U.S.C. §1983—Monell – Policy, Custom, or Practice Failing to Provide Adequate Medical Care

### *(Keith Lavon Cooper v. Corizon Health, Inc.)*

170.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 141 with the same force and effect as if fully set out in specific detail herein below.

171.     At all times relevant, Plaintiff KEITH LAVON COOPER had a constitutional right to be free from cruel and unusual punishment while imprisoned at the Baker Correctional Center.

172.     At all times relevant, Defendant Florida Department of Corrections was acting under color of law.

173.     At all relevant times, the employees, agents, and/or officers of Defendant Corizon Health, Inc., were acting pursuant to an expressly adopted official policy or a longstanding practice or custom of Defendant Corizon Health, Inc.

174.     At all times relevant, it was the duty of Defendant Corizon Health, Inc. to refrain from subjecting others to a deprivation of rights, including Plaintiff COOPER.

175.     Upon information and belief, Defendant Corizon Health, Inc., including its agents, employees, and/or officers at Baker Correctional Center, together with other policymakers and supervisors maintained, *inter alia,* the following unconstitutional customs, practices, and/or policies:

  a.  Failing to provide adequate treatment and services to prisoners, including Mr. Cooper;

  b.  Failing to provide prompt medical treatment, care and procedures despite doctor referrals and requests;

  c.  Failing to provide medication at frequent intervals;

  d.  Failing to allow inmates to seek consults, specialists, or referrals once requested;

  e.  Failing to allow inmates to get testing and procedures, including MRIs in a timely fashion;

  f.  Failing to place inmates in the infirmary despite serious and debilitating injuries;

  g.  Placing seriously injured inmates in solitary or confined cells instead of the infirmary;

  h.  Delaying doctor-ordered testing and procedures;

  i.  Failing to keep adequate records of medicines administered, vital signs, and diagnoses;

  j.   Failing to maintain complete medical records;

  k.  Failing to communicate inmate health status to institutions upon inmate transfer;

l.  Failing to deliver medical care with oversight; and,

m.  Failing to develop a treatment protocol including maintaining full patient records, communicating during patient transfers, check-ins on patients, prompt medical treatment, and follow-up on specialists.

176.   At all material times, Defendants SERGEANT MASSEE, Officer Saylor, Officer Sailee, Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman, Sgt. Phillips, Officer Whitney Stephen, Duty Officer Powell, and Defendant Freeman knew of Plaintiff's serious medical need, including his stab wounds, head wounds, and inability to walk or stand.

177.   Despite this knowledge, Defendants SERGEANT MASSEE, Officer Saylor, Officer Sailee, Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman, Sgt. Phillips, Officer Whitney Stephen, Duty Officer Powell, and Defendant Freeman, intentionally and deliberately delayed providing Plaintiff his needed medical treatment for up to three days.

178.   In so doing, Defendants SERGEANT MASSEE, Officer Saylor, Officer Sailee, Officer Doe Ta, Officer Bickerstaff, Sgt. Jay Burnett, Sgt. Guitherman, Sgt. Phillips, Officer Whitney Stephen, Duty Officer Powell, and Defendant Freeman, consciously disregarded a substantial risk of causing harm to Plaintiff.

179.   Defendant Corizon Health, Inc., together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs alleged above. Despite having knowledge of the above, Corizon Health, Inc. condoned, tolerated and through their own actions or inactions thereby ratified such policies.

180.   The acts or omissions of Defendants as described herein deprived Plaintiff of his constitutional rights and caused him other damages.

181.    Defendant Corizon Health, Inc. also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of Plaintiff COOPER.

182.    Defendant Corizon Health Inc's policies and customs were the moving force in depriving Plaintiff of his statutory and constitutional rights granted under the Fourteenth and Eighth Amendments to the United States Constitution and 42 U.S.C. Section 1983.

183.    As proximate cause of Defendant Corizon Health Inc's policies and customs, Plaintiff suffered physical injury, severe emotional and mental distress, humiliation, and disability.

184.    As a direct and proximate result of the Constitutional violations caused by the employees, agents and/or officers of Defendant Corizon Health, Inc., and other policymakers, Plaintiff Cooper was deprived of his liberty and suffered damages, including physical injury.

185.    Moreover, as a proximate cause of Defendant Corizon Health, Inc.'s longstanding policy and custom of denying access to medical care, Plaintiff suffered injuries and is entitled to recover all damages allowable for constitutional violations such as 42 USC § 1983, including compensatory damages, special damages, economic damages, all costs incurred in prosecuting this action, and attorney's fees pursuant to 42 USC § 1988.

WHEREFORE, Plaintiff COOPER demands judgment against Defendant Corizon Health, Inc. for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

## <u>DEMAND FOR A JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues triable as of right by jury.

Respectfully Submitted,

ROMANUCCI & BLANDIN, LLC

By:    /s Bhavani Raveendran

Attorney for Plaintiff

Bhavani Raveendran

**ROMANUCCI & BLANDIN, LLC**

312 North Clark Street, Ste 900,

Chicago, IL 60654

Tel: (312) 458-1000

Fax: (312) 458-1004

Braveendran@rblaw.net

ARDC No.: 6309968 (Raveendran)

*Pro Hac Vice*

Rodney G. Gregory, Esq.

**THE GREGORY LAW FIRM**

3840 Crown Point Rd., Suite B

Jacksonville, Florida 32257

Ph: 904-398-0012

Fax: 904-398-5131

Rod@gregorylawfirm.net